IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FORREST EUGENE HUNTER, III                                            PLAINTIFF

      v.                         Civil No. 09-5014

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY,
Benton County Detention Center;
DR. JOHN HUSKINS, Jail Doctor,
Benton County Detention Center; and
NURSE MARSHA SMITH, Jail Nurse,
Benton County Detention Center                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Forrest Eugene Hunter, III, filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

The events at issue in this action occurred during two separate periods of incarceration at the Benton County Detention Center (BCDC). Plaintiff's first period of incarceration was from October 3, 2008, to October 8, 2008. Plaintiff's second period of incarceration was from November 16, 2008, to January 15, 2009. While at the BCDC, Plaintiff contends he was denied adequate medical care and his grievances regarding inadequate medical treatment were ignored.

Defendants filed a summary judgment motion (Doc. 23). Plaintiff filed a response (Doc. 28) to the motion. The motion is now ready for decision.

## Background

On October 2, 2008, Plaintiff was treated at the Mercy Emergency Department in Rogers, Arkansas, for abdominal pain, epigastric. (Doc. 25 Ex. 2 at pg. 2). He was instructed to take Buspirone (BuSpar®),[1] and Omeprazole (Prilosec®).[2] Id. Plaintiff was also treated on October 3rd because of a suicide attempt, suicidal behavior, and a headache. Id. at pg. 1. He was advised to continue taking Aleve, Buspirone (BuSpar®), Ibuprofen, and Omeprazole (Prilosec®). Id.

He was booked in the BCDC) on October 3rd. (Doc. 25 Ex. 1 at pg. 1). A suicide risk assessment was completed by Officer Christopher Watson and it was noted that Plaintiff had attempted to commit suicide the previous day in a motel room. (Doc. 25 Ex. 2 at pg. 6). Plaintiff was identified as suicidal and placed in an anti-suicide smock by Deputies Wales and Simmons. (Doc. 25 Ex. 3 at pg. 1). Plaintiff was placed in the detoxification cell where he could be monitored by a camera. Id.

A medical questionnaire was completed as part of the booking process. (Doc. 25 Ex. 2 at pg. 4). Plaintiff's current medications were listed as Morphine Sulphate,[3] Vicodin®,[4]

---

[1] Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (visited 9/1/2010).

[2] Omeprazole is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (visited 9/1/2010).

[3] Morphine Sulfate is a strong analgesic painkiller. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601161.html (visited 9/1/2010).

[4] Vicodin® is a combination product containing Hydrocodone and Acetaminophen. http://www.nlm.nih.gov/medlineplus/druginfo/drug_Va.html (visited 9/1/2010). Hydrocodone is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (visited 9/1/2010). Acetaminophen is used to relieve mild to moderate pain and to reduce fever. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html (visited 9/1/2010).

Tramadol,[5] and nitroglycerin.[6] Id. It was noted that he was under a doctor's care for cardiac and back issues. Id. Plaintiff had no medications in his possession when he booked in. Id. at pg. 2.

On October 4th, Deputy Dunn reported observing Plaintiff with something around his neck. (Doc. 25 Ex. 3 at pg. 2). Deputy Dunn entered the cell and untied a plastic strap that Plaintiff had tied around his neck. Id. Plaintiff was breathing and had "eye response." Id. Plaintiff had torn the strap from his mat. Id. The mat was then removed from the cell. Id.

An ambulance was called and Plaintiff was seen at the Northwest Medical Center. (Doc. 25 Ex. 2 at pg. 7). It was noted that the symptoms[7] Plaintiff was experiencing were due to his long term narcotic use and then its discontinuation. Id. He was informed his symptoms would last until he resumed his medications or for about one week until his system reset. Id. It was stated that whether he could have narcotics in the jail was up to the physician in charge of the jail. Id. His follow-up care was referred to Dr. John Huskins. Id.

On October 6th, Plaintiff asked to move to a cell with a mattress and stated he was feeling better. (Doc. 25 Ex. 4 at pg. 1). He was advised he would remain where he was assigned. Id.

Plaintiff was seen by Dr. Huskins on October 6th. (Doc. 25 Ex. 2 at pg. 8). Plaintiff complained of back pain and indicated he wanted out of the smock. Id. Dr. Huskins' noted Plaintiff had a "history of suicide attempt." Id. Plaintiff informed Dr. Huskins that he had

---

[5] Tramadol is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (visited 9/1/2010).

[6] Nitroglycerin is used to treat episodes of angina (chest pain) in people who have coronary artery disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601086.html (visited 9/1/2010).

[7] No description of the "symptoms" is given on the single page record from Northwest Medical Center. Doc. 25 Ex. 2 at pg. 7.

suffered cardiac problems while in the hospital. Id. Dr. Huskins indicated Plaintiff's medical records should be obtained. Id. On examination, Dr. Huskins found Plaintiff had "some perispinal muscle spasms." Id. Dr. Huskins also detected a heart murmur. Id. Plaintiff was prescribed Tylenol on an as needed basis. Id.

On October 6th, Nurse Marsha Smith requested a copy of Plaintiff's medical records from Dr. Braun of the Coffey County Medical Center. (Doc. 25 Ex. 2 at pg. 9). The records were received on October 8th. Id. The records indicate Plaintiff was being seen for complaints of chronic back pain. Id. at pg. 12. Notes from a visit with Dr. Braun dated September 2, 2008, indicate Plaintiff reported doing well on a regimen of MS Contin®[8] and Vistaril®.[9] Id. Plaintiff was also given a refill of his Tramadol. Id. Note was also made that Plaintiff was going to set up a pain management appointment. Id.

On October 7th, Plaintiff was transported to Vista Health for an involuntary admission. (Doc. 25 Ex. 1 at pgs. 5-7). Defendants' records show Plaintiff was released to Vista Health on October 8th. Id.

Plaintiff was treated at Vista Health until October 23rd. (Doc. 25 Ex. 5 at pg. 1). He was diagnosed with bipolar I disorder depressed phase, post traumatic stress disorder (PTSD), and

---

[8] MS Contin is the brand name for morphine oral. The medication is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html (visited 9/1/2010).

[9] Vistaril® is the brand name for Hydroxyzine. This medication is used to relieve itching caused by allergies, to control nausea and vomiting caused by various conditions, for anxiety, and to treat the symptoms of alcohol withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html (visited 9/1/2010).

unspecified back pain. Id. at pg. 2. When discharged, Plaintiff was prescribed MS Contin®, Klonopin®,[10] Halcion®,[11] Celexa®,[12] and Lithium Carbonate.[13] (Doc. 25 Ex. 5 at pg. 3).

Dr. Dollins of Vista Health noted Plaintiff was "very medication seeking for controlled substances . . . . I have tried to be very direct and up front with him about this and my concern about his ability to manage his medications after discharge . . . when he has control of these and if he will be able to resist the temptation to take more of these than prescribed." (Doc. 25 Ex. 5 at pg. 9). Dr. Dollins also noted that at times Plaintiff "was so focused on wanting more pain medication that within seconds of my telling him I would not prescribe more of these, he was already asking again for more of them." Id.

On November 16th, Plaintiff booked back into the BCDC on a charge of obtaining a controlled substance by false pretenses or theft and criminal impersonation. (Doc. 25 Ex. 1 at pg. 8). A medical questionnaire was completed as part of the booking process. (Doc. 25 Ex. 2 at pg. 15). Plaintiff indicated he was taking Clonazepam(Klonopin®) and suffered from anxiety and a bad back. Id. Deputy Simmons completed a medication inventory and noted Dr. Thomas Hanson had prescribed the Clonazapam. Id. at pg. 18. As part of the booking process, Plaintiff signed a medical insurance information form agreeing to be responsible for any medical bills for pre-existing injury or illness. Id. 2 at pg. 17.

---

[10] Klonopin® is the brand name for Clonzaepam. The medication is used alone or with other medications to control certain types of seizures and to relieve panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (visited 9/1/2010).

[11] Halcion® is the brand name for Triazolam. This medication is used on a short-term basis to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684004.html (visited 9/1/2010).

[12] Celexa® is a brand name for Citalopram. This medication is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (visited 9/1/2010).

[13] Lithium carbonate is used to treat and prevent episodes of mania in people with bi-polar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (visited 9/1/2010).

On November 17th, Plaintiff submitted a medical request asking for treatment for "detox from morphine." (Doc. 25 Ex. 2 at pg. 19). Dr. Huskins saw Plaintiff on November 19th. Id. at pg. 20. Dr. Huskins noted that Plaintiff had been on narcotics and was having some withdrawal symptoms. Id. Dr. Huskins decided to treat Plaintiff with Catapres®[14] and monitor his symptoms. Id. The medication records indicate Plaintiff received this medication from November 19th to November 26th.[15]

On November 20th, Plaintiff was given a disciplinary. (Doc. 25 Ex. 3 at pg. 4). He was placed on ten days lock-down and loss of privileges. Id.

On November 21st, Sgt. Cotton reported that Plaintiff said he needed to be under observation because he had been off his medication too long and had tried to kill himself during another incarceration. (Doc. 25 Ex. 3 at pgs. 6-7). Plaintiff also stated he had been in Vista Health twice since being released. Id. Plaintiff was placed in a tamper resistant smock and placed in holding cell #5 for observation. Id. at pg. 7.

On November 22nd, Plaintiff asked to be seen as soon as possible so he could go back to his ten day lock-down. (Doc. 25 Ex. 4 at pg. 2). Dr. Huskins examined Plaintiff on November 26th. (Doc. 25 Ex 2 at pg. 21). Dr. Huskins' notes reflect that Plaintiff said he was doing well and it was the first time in eight years that he was off narcotics. Id. Plaintiff stated he was

---

[14] Catapres® is the brand name for Clonidine. The medication is used to treat high blood pressure. It may also be used to treat alcohol and opiate (narcotic) withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (visited 9/1/2010).

[15] The medication records submitted to the Court are extremely difficult to read. On most pages, the dates, the type of drug, and even the inmate name are virtually illegible. On a number of the pages someone has rewritten the name of the medication. It is unclear whether this was done when the exhibit was submitted to the Court or at some other time. Doc. 25 Ex. 7 at pgs. 1-16.

AO72A
(Rev. 8/82)

feeling great. Id. Dr. Huskins agreed to release Plaintiff from the smock. Id. The Catapres®
was discontinued. Id.

On November 27th, Plaintiff submitted a medical request stating he was not getting any
sleep. (Doc. 25 Ex. 4 at pg. 3). He asked to talk to the doctor and was put on the list to see him.
Id.

Plaintiff submitted a medical request on December 2nd for numbness in his feet and sleep
issues. (Doc. 25 Ex. 2 at pg. 22). Plaintiff put in another medical request on December 6th. Id.
at pg. 23. He stated that his blood sugar was fluctuating too much. Id. On December 8th,
Plaintiff also requested a regular meal tray because the diabetic tray only contained half enough
food. Id. at pg. 24.

The only indication[16] that Plaintiff was treated by Dr. Huskins following this series of
medical requests is a handwritten notation on Plaintiff's medical request dated December 6,
2008. (Doc. 25 Ex. 2 at pg. 23). In the area of the form in which a response is to be written,
someone wrote: "saw Dr. 12/8." Id. However, Plaintiff must have been seen by the doctor prior
to December 8th because there are medication logs which indicate Plaintiff was prescribed
Naproxen Sodium[17] and received it from December 1st to December 18th. Plaintiff was also

---

[16] In cases involving the BCDC, the Court normally receives as part of the jail medical records a chart that reflects all activity of the jail doctor and jail nurse. No such chart has been submitted in this case.

[17] Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and ankylosing spondylitis (arthritis that mainly affects the spine). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (visited 9/1/2010).

AO72A
(Rev. 8/82)

prescribed Amitriptyline[18] and received it from December 1st to January 15th. (Doc. 25 Ex. 7 at pgs. 5-11).

On December 18th, Plaintiff asked that his Amitriptyline be increased. (Doc. 25 Ex. 2 at pg. 25). It appears his request was granted because the dosage of Amitriptyline was increased from 10 mg. to 25 mg. beginning on December 19th. (Doc. 25 Ex. 7 at pg. 5 & 7). Plaintiff submitted a grievance on December 28th complaining that he was not receiving the proper medication. (Doc. 25 Ex. 4 at pg. 7). Plaintiff stated he had talked to the doctor about this issue. Id. Plaintiff asserted that he had been to Vista Health and put on the medication he had been on for years. Id. However, when he became incarcerated again he was not provided the needed medication and went through withdrawal. Id. Captain Petray responded: "The doctor makes the medical decisions in the jail. If you have a medical issue, then you need to put in a medical." Id.

On January 6, 2009, Plaintiff requested medical care and stated he would agree to sign a release for his records from Vista Health because he was not receiving his medication. (Doc. 25 Ex. 2 at pg. 26). Plaintiff was put on the list to see the doctor. Id. Plaintiff's medical records from Vista Health were requested on January 7th. (Doc. 25 Ex. 2 at pg. 27). The records of Vista Health do not appear in the jail medical file so it is unclear whether they were received before Plaintiff's release on January 15th or at some later point. (Doc. 25 Ex. 2). The Vista Health records submitted with the summary judgment motion were obtained, presumably during discovery, in January of 2010. (Doc. 25 Ex. 5).

---

[18] Amitriptyline is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (visited 9/1/2010).

AO72A
(Rev. 8/82)

On January 8, 2009, Plaintiff submitted a medical request for treatment for cracking feet. (Doc. 25 Ex. 2 at pg. 28). His request for Vaseline was approved. Id. On January 12th, Plaintiff requested additional Vaseline. Id. at pg. 29. His request was approved. Id. On January 14th, he again requested Vaseline and this request was approved. Id. at pg. 30. The medication records indicate Plaintiff received Vaseline from December 29th to December 31st, from January 9th to January 10th, and from January 12th to January 13th. (Doc. 25 Ex. 2 at pgs. 2-4).

Plaintiff was released from the BCDC on January 15th. (Doc. 25 Ex. 2 at pg. 31). While incarcerated at the BCDC, Plaintiff was prescribed the following medications: Amitriptyline; Vaseline; Naproxen Sodium; Tussin; Clonidine (Catapres®); Acetaminophen; Aspirin; and Antacid. (Doc. 25 Ex. 7). As discussed above, the only records of visits with Dr. Huskins are as follows: October 6, 2008, Tylenol prescribed; November 19, 2008, Catapres® prescribed; and November 26, 2008, Catapres® discontinued. (Doc. 25 Ex. 2 at pgs. 8, 20, and 21). There are no other records of visits with the nurse or the doctor. It would appear other visits occurred as Plaintiff was prescribed Amitriptyline; Naproxen Sodium; Tussin; Aspirin; and Antacid

On January 22nd, Plaintiff was seen at Coffey County Medical Center in Burlington, Kansas. (Doc. 25 Ex. 6 at pg. 2). He voiced several complaints and requested medication refills. Id. Dr. Jon Sides noted that Plaintiff reported having been diagnosed with bipolar disorder but was unsure of his Lithium and Clonazepam dosages. Id. Plaintiff also complained of chronic back pain and mild hypertension. Id. Plaintiff indicated he had been out of medication for one to two weeks. Id. Dr. Sides assessed Plaintiff with back pain, bipolar disorder, and "chronic pain medications" noting "there is some concern for chronic pain medication use." Id. Plaintiff

was given refills for Clonazepam and Lithium.  Id.  He was also given a prescription for Lortab®.[19]  Id.  Dr. Sides noted, "[w]e will monitor [pain medication] usage closely."  Id.  Plaintiff was to follow up with Dr. Braun in one month.  Id.

Plaintiff was seen at Coffey County Medical Center again on February 16th.  (Doc. 25 Ex. 6 at pg. 3).  He was given refills for Hydrocodone, Clonazepam, and Lithium.  Id.  He was to follow-up with his primary care physician in one month.  Id.

Plaintiff was seen at Coffey County Medical Center on February 25th, March 17th, April 20th, April 27th, May 15th, and May 20th.  (Doc. 25 Ex. 6 at pgs. 4-11).  The May 20th visit was after a possible overdose of Clonazepam and Hydrocodone.  Id. at pg. 9.  On May 22nd, a letter was written to Plaintiff notifying him that Coffey County Medical Center would no longer be able to provide medical care to him after June 25, 2009, and their physician-patient relationship would end.  Id. at pg. 12.

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence,

---

[19] Lortab® is a combination product containing Acetaminophen and Hydrocodone.  It is used to treat moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (visited 9/1/10).

-10-

showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

In their motion for summary judgment, Defendants argue that the case must be construed to be against them in their official capacities only because Plaintiff did not indicate in the complaint that he was asserting individual capacity claims against them. As there is no proof of an unconstitutional custom or policy, Defendants maintain they are entitled to judgment as a matter of law. Defendants further argue that Plaintiff was not denied adequate medical care. Defendants maintain that Plaintiff saw jail medical personnel on numerous occasions, was provided with medication, and received all medical treatment and/or medication ordered. Defendants also maintain that there is no constitutional right to have answers to grievances. Finally, Defendants maintain they are entitled to judgment as a matter of law because Plaintiff has suffered no actual physical injury.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the

United States. In order to state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the Defendants acted under color of state law and that they violated a right secured by the Constitution. Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999).

### *Official Capacity and Individual Capacity Claims*

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both. In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the Gorman case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Id. 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. Id. 502 U.S. at 25-27, 112 S. Ct. at 362.

Gorman, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also Andrus v. Arkansas, 197 F.3d 953, 955 (8th Cir. 1999)(in actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in

his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); Egerdahl v. Hibbing Comm. Coll., 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

Plaintiff responds to Defendants' argument by asserting that the Defendants "are the very ones responsible for the safety of every inmate[,] including me." Doc. 28 at pg. 1. It is clear from this response that Plaintiff does not fully comprehend the distinction between individual capacity and official capacity claims. This distinction is at times difficult for even those with legal training to make. See e.g., Vanhorn v. Oelschlager, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the distinctions between official and individual capacity claims and the immunities available). Given the duty of the Court to liberally construe *pro se* pleadings, Plaintiff's statement in his summary judgment response, and the fact that it does not appear Defendants will be unfairly prejudiced in anyway, I will construe the complaint as asserting both official and individual capacity claims against the Defendants.

### *Denial of Adequate Medical Care Claim*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998)(citation

-13-

omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." Hartsfield v. Colburn, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006).

To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

"This duty to provide medical care encompasses detainees' psychiatric needs." Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted); see also Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs").

Obviously, a psychiatric or mental condition can constitute a serious medical need and pose a risk of serious harm. Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000).

While he was seen on a number of occasions by Dr. Huskins, Plaintiff argues nothing was done to treat his psychological and physical problems. Doc. 28 at pg. 2. He states Defendants were well aware of his treatment at Vista Health and did not ensure he received any medication or other treatment for his bipolar disorder or PTSD. Id. Even after his medical records were obtained by the BCDC, he asserts they did nothing to obtain his medication for his psychiatric needs. Id. at pg. 3. Moreover, with his back condition, he states he was not allowed a mattress or a blanket. Id. Additionally, when he was in general population, Plaintiff states he was forced to stay outside his cell at picnic tables from 4:30 a.m. to 8:00 p.m. Id. at pgs. 3-4. Finally, he argues he submitted requests and grievances for two months with no results. Id.

Defendants maintain that Plaintiff has only presented evidence that could show he was disappointed or that he disagreed with the types and doses of medications he received while incarcerated. Defts' Brief (Doc. 24) at pg. 8. They maintain this is not actionable under the Eighth Amendment.

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id. Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell

so far below the reasonable standard of care as to constitute deliberate indifference. See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

In this case, there is no indication in the summary judgment record of when the jail medical staff became aware of Plaintiff's diagnoses of bi-polar disorder or PTSD. The diagnoses were made during his stay at Vista Health from October 7th to October 23rd. However, the only record evidence is that the jail medical staff did not request Plaintiff's records from Vista Health until January 7, 2009. Doc. 25 Ex. 2 at pg.27.

Nevertheless, it is clear that Defendants were aware of Plaintiff's suicidal tendencies and of at least one attempted suicide before he was first booked into the jail on October 3rd. Id. at pg. 6, Plaintiff was assessed as a suicide risk and placed in suicide smock. Id. On October 4th, Plaintiff tied a plastic strap around his neck and had to be taken to the hospital by ambulance. Doc. 25 Ex. 3 at pgs. 2 & 7. He was transferred from the jail to Vista Health for inpatient care. Doc. 25 Ex. 1 at pgs. 5-7.

When Plaintiff was booked back in on November 16th, he had Clonazepam, a medication to relieve panic attacks, with him. Doc. 25 Ex. 2 at page 18. On November 21st, Plaintiff was again placed in an anti-suicide smock and moved to observation. Doc. 25 Ex. 3 at pgs. 6-7.

At least portions of Plaintiff's jail medical records are either missing or were not submitted to the Court with the summary judgment motion. As discussed above, Plaintiff was clearly seen on other occasions by either Nurse Smith or Dr. Huskins and prescribed various medications. Given the lack of any evidence in the record regarding when Defendants became aware of Plaintiff's psychiatric condition and the obvious fact that portions of the Plaintiff's jail

AO72A
(Rev. 8/82)

medical records are missing from the summary judgment record, I believe there are questions of fact that preclude summary judgment in favor of Dr. Huskins and Nurse Smith.

With respect to Plaintiff's claims that the grievance procedure was inadequate, I agree with Defendants that merely not receiving responses to grievances or receiving responses believed to be inadequate does not state a separate claim of constitutional dimension. In general, "[i]nmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." Ashann-Ra v. Commonwealth of Virginia, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted); see also Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); Blagman v. White, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), aff'd, 3 Fed. Appx. 23 (4th Cir. 2001).

However, in this case the Plaintiff maintains he was being denied adequate medical care and that his grievances regarding the inadequate medical treatment were ignored. Plaintiff may use the existence of grievances and the responses, or lack of responses, to establish deliberate indifference to serious medical needs on the part of the Captain Petray and Sheriff Ferguson. Defendants may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." Langford v. Norris, No. 09-1862, 2010 WL 2813551, *10 (8th Cir. July 20, 2010)(citation omitted). Captain Petray responded to Plaintiff's requests and grievances and therefore had actual knowledge of Plaintiff's serious medical needs and of his complaints of inadequate treatment. I believe there is a genuine issue of fact as to whether Captain Petray exhibited deliberate indifference to Plaintiff's serious medical needs.

AO72A
(Rev. 8/82)

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical care and prescription medications. County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff. Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible.").

### *Physical Injury Requirement*

Defendants final argument is that they should be granted judgment as a matter of law because Plaintiff suffered no actual physical injuries as required by the Prison Litigation Reform Act (PLRA). Codified as 42 U.S.C. § 1997e(e), section 803(d) of the PLRA provides as follows: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

The provision limits the available damages in the absence of a physical injury but does not preclude a plaintiff from pursuing a claim. See Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)(The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); see also Pool v. Sebastian County, 418 F.3d 934, 942 n.2 (8th Cir. 2005)(Section 1997e(e) presents an issue of damages under the PLRA). As Plaintiff's denial of medical care claims will proceed, I decline at this point to attempt to determine whether his claimed injuries of pain caused by an aggravation of a chronic back condition and any harm he

suffered as a result of not receiving his psycho tropic medication are sufficient to enable him to recover damages for his mental pain and suffering under § 1997e(e).

## Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 23) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **2nd day of September 2010.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)